UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ARTHUR MILLER,

                    Petitioner,                    **DECISION AND ORDER**
                                                   No. 01-CV-0657

          -vs-

HANS G. WALKER, Superintendent,

                    Respondent.
_____

## INTRODUCTION

Petitioner, Arthur Miller ("Miller"), filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court on charges of robbery and petit larceny. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Miller's conviction stems from his involvement in the robbery of a Wilson Farms convenience store in the City of Rochester on December 22, 1995. Miller was charged with first and second degree robbery and petit larceny. The other perpetrator, David "Chainsaw" Adams ("Adams"), was arrested and similarly charged. Adams gave a confession admitting to several crimes, including the Wilson Farms robbery. He stated that he had a black male as an accomplice, but he refused to give this individual's name. Adams subsequently pled guilty to the charges against him. Miller was subsequently identified through other sources as the accomplice. Miller was tried before a jury in Monroe County Court (Bristol, J.).

At trial, Nia Harrison ("Harrison"), who was working as a cashier that night, testified that at about 8:50 p.m., a white male wearing a bandanna on his head and a black male wearing a black and yellow jacket came into the store. The black male put three items on the counter to be rung up–a six-pack of beer, a rose, and a Slim Jim. T.262.[1] Harrison recalled that he asked her if she would like him to buy her a rose; however, she declined. When Harrison opened the cash drawer to make change for the $10 bill that the black male had given her, the white male came over and told her to leave the drawer open. T.263. He said that he had a gun and motioned with his hand, which was in his coat pocket, as if he had a weapon. T.263. Harrison gave the white male all the money in the drawer plus the $10 bill. During that time, the black male was taking items of merchandise that were around the cash register. The black male did not pay for any of those items. T.264. Harrison could not identify Miller from a police mug book, but she did identify him at trial. As defense counsel pointed out, however, Miller was the only black male in the courtroom.

The two men then left together, and Harrison called out to the store manager, Michelle Rich ("Rich"), who then ran outside and attempted to get the license plate number of the robbers' car. Once outside, Rich saw a black hatchback backing out in reverse, and she recognized the white male and black male men she had seen at Harrison's cash register inside the store. (Rich did not witness the robbery, however.) Rich testified that the black male in the car was "looking directly at her, yelling something" and "shaking his head around." He then "tapped a barrel of a gun on the window." T.354. Rich could not hear what he was saying. *Id.* Rich described the handgun as silver-colored. *Id.*

---

[1]  Citations to "T.__" refer to the trial transcript.

The Wilson Farms happened to be equipped with a video camera, so the entire robbery was captured on videotape. The tape was introduced into evidence and Harrison gave a narration of the events depicted on it, consistent with her testimony. The videotape depicted Miller consistently moving to the end of the line he was standing in. It also showed Miller and Adams, standing together, watching people come into the store.

Tracey Van Orden ("Van Orden"), Chainsaw Adams's girlfriend, testified for the prosecution that she was waiting in the car (a black hatchback) outside with Miller's brother, Kenzo Miller ("Kenzo"), during the robbery. T.289. She saw the cashier lean over and hand Adams the money, but she did not see what Miller was doing. *Id.* Adams and Miller came out and got in the car; Adams took the money and threw it at Kenzo and said that "he was not no punk." T.290. Apparently, Kenzo had called Adams a "punk" because he (Adams) had not carried through on a robbery of a Radio Shack attempted earlier that evening. T.309. Adams was in the driver's seat and Miller was in the back. T.304. When asked what Miller did while Rich was attempting to write down the license plate number, Van Orden said that Miller "[t]urn[ed] back" "[t]owards the lady." She continued, unprompted, "Everybody said he had a gun there, but I didn't see no gun." T.291. The court sustained defense counsel's hearsay objection to that statement.

Van Orden then testified that she did not see what Miller had in his hands. T.291. The prosecutor asked to have Van Orden declared a hostile witness and attempted to impeach her with a statement she made to police on April 15, 1996, in which she said that she "knew" Miller had a silver-colored handgun in his pocket because "[i]t was Chainsaw's gun, and it was supposed to be passed to A.J. [Miller]." T.299-300. She maintained that she did not see the gun

with her own eyes, however. T.299.

Van Orden admitted that the week prior to trial, she met with the prosecutor and told him that she saw Miller show a handgun to Rich, the store manager who had come outside. T.303. Van Orden testified that she was lying when she told the prosecutor that, and that she was telling the truth at trial. *Id.*

On cross-examination, Van Orden testified that Adams told her that "if anybody mention [*sic*] anything about a gun, just say that Arthur Miller had it in his possession." T.308. She said that was why she told the authorities in the first place that Miller had a gun. *Id.*

Investigator Douglas Boccardo ("Boccardo") of the Rochester Police Department testified that he took a statement from Miller on April 17, 1996, after Miller had been picked up as a suspect in the Wilson Farms Robbery. T.321-22. Miller was advised of his *Miranda* rights and voluntarily agreed to waive them.  In his statement, Miller did not admit to participating in the robbery but did admit to stealing some Slim Jims:

> . . . All the way there they [Chainsaw and Kenzo and another white male, "Tim"] were arguing and telling each other that they fucked up, I guess because they didn't get shit at Radio Shack. Chainsaw pulled into the parking lot at the Wilson Farms. I told him that I was going in and getting something to drink. They told me to hurry the fuck up and get out because they had something else to do. I figured they were going to steal some more shit because they fucked up and didn't get anything at the Radio Shack. I went in by myself and got a six-pack of beer and a rose and went up to the cash register. I was kind of flirting with the girl at the cash register and I asked her if she wanted a rose. Chainsaw came in the store and up to the cash register. I paid for my stuff, the rose and that beer and when the cash drawer opened, Chainsaw stuck his hand inside his jacket like he had a gun and told the girl to give him the money. I grabbed some Slim Jims from the display by the register and left. I don't remember who left the store first, me or Chainsaw. I didn't have anything to do with that shit. I didn't know what he was up to. . . .

T.339-40. According to Miller's statement, the car they were using was a new black hatchback

belonging to his girlfriend.

On November 25, 1996, the jury returned a verdict convicting Miller of robbery in the first degree, robbery in the second degree, and petit larceny, as charged in the indictment. Miller was sentenced to determinate concurrent sentences of fifteen years incarceration for each of the robbery counts and one year for the petit larceny count.

Represented by new counsel, Miller appealed to the Appellate Division, Fourth Department, of New York State Supreme Court, which unanimously affirmed his conviction on February 16, 2000. *People v. Miller*, 269 A.D.2d 746, 703 N.Y.S.2d 413 (App. Div. 4th Dept. 2000). The New York Court of Appeals denied leave to appeal on May 31, 2000. *People v. Miller*, 95 N.Y.2d 800, 733 N.E.2d 240, 711 N.Y.S.2d 168 (N.Y. 2000). Miller did not file any collateral applications in state court for post-conviction relief.

This habeas petition was filed on June 4, 2001. As grounds for relief, Miller raises the same four grounds that he asserted in his direct appeal. Respondent has not asserted the defense of non-exhaustion, and all of Miller's claims appear to be fully exhausted and properly before this Court for review.  For the reasons set forth below, Miller's petition for a writ of habeas corpus is denied.

## DISCUSSION

### Standard of Review

To prevail under 28 U.S.C. § 2254, as amended in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was

based on an unreasonable factual determination in light of the evidence presented in state court.

*See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

**Merits of the Petition**

**1.      Excessiveness of pre-trial bail**

"It is clear that federal habeas corpus is available to test the constitutionality of the

excessiveness--or denial--of bail by a state court to a prisoner awaiting trial." *Bobick v. Schaeffer*,

366 F. Supp. 503 (S.D.N.Y. 1973) (citing *In re Shuttlesworth*, 369 U.S. 35, 82 S.Ct. 551, 7

L.Ed.2d 548 (1962); *United States ex rel. Covington v. Coparo*, 297 F. Supp. 203 (S.D.N.Y.

1969)); *accord Steed v. New York Executive Dept. Div. of Parole*, 2000 WL 1593342, at *5

(S.D.N.Y. Oct. 25, 2000). It is equally clear, however, that a federal court will only inquire into

whether the state judge's setting of bail is arbitrary or discriminatory or results in the denial of

counsel or the denial of a fair trial. *Id.* (citation omitted); *see also Finetti v. Harris*, 609 F.2d 594,

599 (2d Cir. 1979) ("[W]hile there is no absolute federal constitutional right to bail pending

appeal, once a state makes provision for such bail, the Eighth and Fourteenth Amendments

require that it not be denied arbitrarily or unreasonably.") (citing *Brown v. Wilmot*, 572 F.2d 404,

405 (2d Cir. 1978)).

At the time of the bail hearing on June 3, 1996, Miller was out on $10,000 cash or bond.

The prosecutor noted the Miller was a predicate felon from 1990 on an assault charge, and that

he had a bench warrant history and several misdemeanor charges, including a 1995 conviction of

second degree menacing. The prosecutor asked the court to leave the bail at $10,000 or raise it to

$25,000 cash, given the strength of the People's case, combined with Miller's bench warrant

history and predicate felon status. The prosecutor noted that, as a result of Miller's statement to

the police, there were two witnesses who testified at the preliminary hearing what Miller and his

co-defendant did while in and out of the store on the day of the robbery. Defense counsel argued

that the People's case was not that strong, acknowledged his client's predicate felon status and

warrant history, and asked the court to set bail at $7,500. The court paused to read the bail report

prepared by the prosecution and then announced, "Hundred thousand cash will be fine." B.8.[2]

Just prior to trial, defense counsel asked the trial judge to recuse himself, based on his

imposition of "excessively high bail." The judge denied the request and stated that he had "no

anger or animosity" toward Miller but that he "thought [Miller's] record and the strength of this

case justified a significant bail, given the significant jeopardy that is here." T.11-12. The judge

assured Miller that he would give him (Miller) a fair trial. *Id.*

The court's articulated reason for setting Miller's bail was neither arbitrary nor

discriminatory. Indeed, a court is entitled to exercise its independent judgment in setting bail and

should not be confined to the prosecutor's recommendations in exercising its discretion.

Furthermore, after reading the transcript of petitioner's trial in its entirety, there is no question in

this Court's mind that he received a fair trial. This claim is without merit.

**2.     Abuse of discretion in trial court's limitation of cross-examination**

Miller contends that the trial court abused its discretion when it interfered with defense

counsel's proper cross-examination of an adverse witness. During cross-examination of

prosecution witness Van Orden, the co-defendant's girlfriend, defense counsel attempted to ask

her leading questions requiring a "yes" or "no" response. When counsel interrupted the witness

as she began to answer more than "yes" or "no," the trial court told him he was being impolite

---

[2] Citations to "B.___" are to the transcript of the bail hearing.

and made counsel allow the witness to answer how she wanted:

> Q.     And when you pulled into the Wilson Farms, isn't it a fact that Mr. Miller got out of the car first and walked into the store by himself?
> A.     Yes. On that - -
> Q.     And that David Adams - -
> The Court:     Excuse me. Let her finish her answer.
> A.     David Adams came from behind, and when he got in, the thing had already - - the lady had already opened the cash register for AJ [Miller].
> The Court:     Let her finish the answer and then it's your turn. If you think it's unresponsive, sir, I will entertain a motion to strike it.
> Mr. Murray:     Judge, this - -
> The Court:     But we can't all be talking at the same time. So I direct you, sir, to let her finish her answer; okay?
> Mr. Murray:     I am cross-examining the witness.
> The Court:     Fine. But you can't do it at the same time she is talking.
> Mr. Murray:     I don't believe that she can be allowed to answer more than I have asked.
> The Court:     I will decide that, not you.
> Q.     So there was no conversation in the car, prior to pulling into the parking lot about robbing Wilson Farms; correct?
> A.     Chainsaw was telling Kenzo that he was - -
> Mr. Shur [*sic*]:     Objection, Your Honor.
> The Court:     Overruled. Let's hear what she has got to say. You started to say.
> A.     They went - -
> The Court:     Time out. Time out. We are going to - - This isn't in the courtroom law, it's called politeness. When you talk, I listen. When I talk, you listen. It goes for everybody. That is what my mama taught me. Go ahead. Finish. You started to say that Chainsaw told Kenzo - -

T.311. Van Orden continued her testimony. That was the last incident of that kind during the trial.

A criminal defendant's "most basic right" is that of a "fair trial at which the witnesses against him might be meaningfully cross-examined." *United States v. Wade*, 388 U.S. 218, 224,

87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967) (quoted in *United States v. Medico*, 557 F.2d 309, 321 (2d Cir. 1977)). On cross-examination, leading questions are appropriately directed toward a witness called by an adverse party. Certainly, it was appropriate for defense counsel to insist that Van Orden, a prosecution witness, answer his leading questions with a simple "yes" or "no," so as to avoid the possibility that defense counsel might help make the prosecution's case for it. Thus, I have no difficulty in determining that the trial court's interference with defense counsel's cross-examination was clearly erroneous and evidenced a lack of understanding of the basic premise of cross-examination.

Nevertheless, it does not appear that the trial court was acting out of personal animosity toward petitioner or that he was singling out defense counsel; the court sustained a number of defense counsel's objections and limited the prosecutor's questioning of witnesses as well. Rather, it appears that the trial judge was mistaken about the basic rules of cross-examination.

Reversal based on inappropriate judicial participation is warranted only when such conduct "destroy[s] the impartial, judicious, and, above all, responsible . . . courtroom atmosphere in which guilt or innocence [must] be soberly and fairly tested." *United States v. Navarro*, 472 F.2d 302, 309-11 (2d Cir. 1973) (reversing conviction where trial judge's vigorous participation in examining defendant and defense witness, especially when contrasted with relative freedom from hostile interruption of prosecution's witnesses, and numerous acrimonious exchanges with defense counsel, many of which occurred in the presence of the jury, destroyed the impartial and judicious courtroom atmosphere; error not cured by cursory charge that jury should not draw any inference from rulings made during course of trial) (quotations omitted). This, however, clearly was not a case where the trial court's limited, albeit erroneous,

interference with defense counsel's questioning crossed the line "separating permissible and impermissible judicial conduct," *Navarro*, 472 F.2d at 313. Habeas relief is not warranted on this claim.

**3.     Trial court erred in refusing to give missing witness charge**

After both sides rested, defense counsel requested that the court give a missing witness with respect to co-Chainsaw Adams. Defense counsel claimed that Adams was under the control of the prosecution and he "no longer could assert any right against self-incrimination." Defense counsel argued that since Adams was not produced, one could infer that it was because he "would not have been beneficial to the People's case." T.369. The prosecutor responded that Adams's testimony would be cumulative and that the request was untimely. The prosecutor also noted that he had provided defense counsel with the witness list at the beginning of trial, and Adams was not on it. Finally, he stated that based on the discovery documents provided to the defense and given the way that Adams's girlfriend testified, there was no indication that Adams would cooperate with or testify favorably on behalf of the People. T.369-70. The trial court summarily denied the application. T.370.

On direct appeal, the Appellate Division held that the trial court properly denied defense counsel's request for a missing witness charge as untimely. *People v. Miller*, 269 A.D.2d at 746-47 (citing *People v. Gonzalez*, 68 N.Y.2d 424, 509 N.Y.S.2d 796 (N.Y. 1986)). Respondent argues that Miller's claim is procedurally barred, given the Appellate Division's ruling that counsel's request, made after the close of evidence, was untimely. Respondent, however, has not cited one case in which a federal habeas court has found such a claim to be procedurally barred when counsel requested the charge after the close of evidence. Consequently, the Court will

-10-

consider Miller's claim on the merits. *Accord*, *e.g.*, *Wright v. Marshall*, 2005 WL 1861633, at *4 (E.D.N.Y. Aug. 4, 2005).

Ordinarily, a state trial court's jury instruction, such as a missing witness charge, is a matter of state law. Like the failure to give any other jury instruction, the failure to issue a missing witness instruction does not raise a constitutional issue and cannot serve as the basis for federal habeas relief unless the failure "so infected the entire trial that the resulting conviction violated due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *accord*, *e.g.*, *Leecan v. Lopes*, 893 F.2d 1434 (2d Cir. 1990). The Second Circuit has explained that "[w]hether a missing witness charge should be given lies in the sound discretion of the trial court." *Reid v. Senkowski*, 961 F.2d 374, 376 (2d Cir. 1992). Moreover, reviewing courts have been loathe to remove the issue from the trial judge's discretion given "'the usual aura of gamesmanship'" that frequently accompanies requests for a missing witness charge as to which the trial judge will have a surer sense than the appellate court." *United States v. Torres*, 845 F.2d 1165 (2d Cir. 1988) (quoting *United States v. Erb*, 543 F.2d 438 (2d Cir. 1976)).

As the Supreme Court explained, "[t]he rule . . . in criminal cases is that if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893) (quoted in *People v. Gonzalez*, 68 N.Y.2d 424, 502 N.E.2d 583 (N.Y. 1986)). This adverse inference instruction, commonly known as a "missing witness charge," "derives from the commonsense notion that 'the non-production of evidence that would naturally have been produced by an honest and therefore fearless claimant permits the inference that its tenor is

unfavorable to the party's cause.'" *Gonzalez*, *supra* (quoting 2 Wigmore, Evidence § 285, at 192 (Chadbourn rev. ed. 1979)). The mere failure to produce a witness at trial is not, in and of itself, insufficient to justify the missing witness charge. *Id.* Rather, the party seeking such a charge must show that "the uncalled witness is knowledgeable about a material issue upon which evidence is already in the case; *that the witness would naturally be expected to provide noncumulative testimony favorable to the party who has not called him*, and that the witness is available to such party[.]" *Id.* (emphasis supplied).  The burden then shifts to the opposing party to account for the witness's absence or otherwise demonstrate that the charge is not warranted, such as by showing, for instance, that the witness is not knowledgeable about the issue or that the testimony would be cumulative. *People v. Macana*, 84 N.Y.2d 173, 639 N.E.2d 13, 615 N.Y.S.2d 656 (N.Y. 1994). A missing witness charge would be appropriate "if it is demonstrated that the party had the physical ability to locate and produce the witness, and there was such a relationship, in legal status or on the facts, as to make it natural to expect the party to have called the witness to testify in his favor." *Gonzalez*, *supra*.[3]

---

[3]  The New York Court of Appeals reversed defendant's conviction in *Gonzalez* based on the trial court's failure to give missing witness charge where "defendant adequately met the threshold requirements to entitle him to a missing witness charge by bringing to the court's attention the failure of the People to call a witness [the complainant's husband] with knowledge about a material issue in the case and who would be expected to testify favorably to the People." First, the complainant's own testimony concerning her husband having seen the defendant fleeing immediately after the crime demonstrated that the husband was knowledgeable about a material issue: the identity of defendant as one of the assailants. The court found it was "[e]qually certain" that the husband's potential testimony was material since the prosecution's case "rested entirely upon the complainant's testimony and identification of the defendant" and the complainant's "credibility had been impeached on cross-examination such that corroboration of her testimony was crucial." The *Gonzalez* court refused to accept the state's argument that the testimony of the complainant's husband would have been cumulative since such a determination "must be made by the trial court who is best suited to determine the issue in light of the facts and circumstances of each case" and there was "no support in the record before us to indicate that the testimony would have been cumulative." *Id.* Additionally, the court found, "defendant established that the uncalled witness would be expected to testify favorably to the People and adversely to him such that he could be considered to be in the People's control." The uncalled witness was the common-law spouse of the complainant and the father of complainant's four-year-old son, and they had resided together for seven years. The court found that "[t]hese facts, without any rebuttal from the People at the time of the request to charge, sufficiently established that the uncalled witness, by virtue of his relationship with the

At the outset, I note that Adams pled guilty prior to trial; it was not indicated in the record what charges were the basis for his guilty plea. He presumably was in jail at the time of Miller's trial, as he had been sentenced to ten years in prison. For several reasons, I cannot find that the trial court erred in refusing to give a missing witness charge. Simply because a co-defendant accepts a reduced sentence in exchange for a guilty plea does not mean that he is in the control of the prosecution such that he would be expected to testify favorably for the state, especially where, as here, the co-defendant did not secure a more lenient sentence by implicating the defendant. *Cf. People v. Williams*, 186 A.D.2d 469, 589 N.Y.S.2d 155 (App. Div. 1st Dept. 1992) (rejecting contention that missing witness charge was warranted since there was no evidence that the co-defendant's testimony would have been favorable to the prosecution merely because the co-defendant pleaded guilty by accepting a plea).

Furthermore, this appears to be a case where, in requesting the adverse inference charge with respect to Adams, defense counsel was engaging in a certain amount of gamesmanship. Indeed, defense counsel knew of his identity and what his probable testimony would be, yet chose not to call him. *See People v. Buckler*, 39 N.Y.2d 895, 386 N.Y.S.2d 396 (N.Y. 1976) (upholding refusal to give missing witness charge, in part because defendant knew of the missing witness's identity and chose not to call him). During discovery, defense counsel was provided with Adams's lengthy statement to the police in which he admitted to a committing number of robberies, including the Wilson Farms robbery, to support his severe drug habit. In the confession, Adams pointedly refused to identify Miller as his accomplice, stating that he would

---

complainant, would naturally be expected to testify in support of the People's position and adversely to the defendant's case." *Id.*

"rather not mention" the name of the "black guy" with whom he committed the Wilson Farms robbery. Thus, defense counsel well knew that Adams most probably would have been a witness adverse to the prosecution's interests because of his refusal to identify Miller as the accomplice to the crime. *Cf. People v. Hilts*, 191 A.D.2d 779, 594 N.Y.S.2d 408 (App. Div. 3d Dept. 1993) ("While it is clear that [co-defendant] was knowledgeable about a material issue in the case, there was no showing that he could be expected to testify favorably to the prosecution. Indeed, without such a showing, the contrary is much more inferable[.]"). However, the prosecution cannot be faulted for failing to call a witness who would not have provided favorable testimony; the prosecutor understandably was not interested in calling Adams to the stand in order to have him refuse to identify Miller as his partner in crime. Defense counsel ostensibly had equal access to Adams and could have called him to testify but did not–most likely because Adams, an admitted cocaine addict who had committed numerous robberies in order to support his drug habit, would have been subject to potentially withering impeachment. And, not only did defense counsel fail to show that Adams would have testified favorably due to his relationship with the prosecutor, defense counsel offered nothing to show that Adams's testimony would not have been cumulative to Van Orden's. *See People v. Almodavar,* 62 N.Y.2d 126, 464 N.E.2d 463 (N.Y. 1984) (rejecting claim that missing witness charge was warranted where "[t]here was nothing to indicate that [the missing witness's] testimony would have contradicted or added to that of the other witnesses").

The trial court's factual findings regarding defense counsel's failure to establish Miller's entitlement to the missing witness charge are entitled to substantial deference, and Miller has not met his burden of overcoming the presumption of correctness by clear and convincing evidence.

-14-

*See* 28 U.S.C. § 2254(e)(1); *see also Castro v. Fisher*, 2004 WL 2525876, at *5 (S.D.N.Y. Nov.

8, 2004) (denying habeas relief to petitioner who asserted entitlement to missing witness charge

based on reading of New York law; the trial court's judgments as to informant's unavailability

and immateriality to central issues in case were factual determinations entitled to presumption of

correctness under § 2254(e)(1)). Habeas relief accordingly is not warranted on this claim.

4.      **Vindictive Sentence**

        Miller contends that he was sentenced vindictively to a sentence of fifteen years because

he exercised his right to go to trial. He claims that the trial court's vindictiveness is evidenced by

the ten-year sentence received by co-defendant Chainsaw Adams, who pleaded guilty after being

charged with three offenses based on his participation in the Wilson Farms robbery.

        During the sentencing hearing, the trial court compared Wilson to Adams, saying that

"Chain Saw [*sic*] would at least come in and take a plea and says [*sic*] I am bad, I did all of this

stuff and I'm sorry." S.10.[4] The court commented that after watching the store videotape of the

robbery, he had "never seen a clearer case of someone acting in concert." *Id.* He stated that Miller

was "too thoughtless, too impaired to understand that [he] [was] a partner" in the robbery. *Id.*

Based on these considerations, the trial court sentenced Miller to a fifteen-year term of

imprisonment.

        I do not find in the trial court's remarks an implicit suggestion that Miller should be

penalized for exercising his constitutional right to a trial; rather, it was Miller's lack of remorse

and refusal to accept responsibility of his actions that animated the judge's sentencing decision.

The Supreme Court has explained that "the evolutionary history of sentencing . . . demonstrates

_____

        [4] Citations to "S.__" refer to the transcript of the sentencing hearing.

that it is proper--indeed, even necessary for the rational exercise of discretion--to consider the defendant's whole person and personality, as manifested by his conduct at trial and his testimony under oath, for whatever light those may shed on the sentencing decision." *United States v. Grayson*, 438 U.S. 41, 53, 98 S.Ct. 2610, 2617, 57 L.Ed.2d 582 (1978). It is well-recognized that a defendant's manifestation of remorse and his acceptance of responsibility for his conduct are proper factors to consider in sentencing. *E.g.*, *United States v. Jacobson*, 15 F.3d 19, 23 (2d Cir. 1994) (finding a defendant's lack of remorse to be an individual, distinctive factor that may support sentencing disparity); *United States v. Blair*, 958 F.2d 26, 30 (2d Cir. 1992) (upholding denial of sentencing adjustment under federal sentencing guidelines where defendant accepted responsibility one week before sentencing, suggesting lack of sincerity); *United States v. Cousineau*, 929 F.2d 64, 69 (2d Cir. 1991) (adjustment under federal sentencing guidelines properly denied where defendant admitted guilt but did not show remorse or acknowledge wrongfulness of conduct).

"While the Fifth Amendment provides a 'safeguard against judicially coerced self-disclosure' that extends to the sentencing phase of a criminal proceeding, *Mitchell v. United States*, 526 U.S. 314, 322, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (quotation omitted), it does not bar a court from considering a defendant's lack of remorse." *Geraci v. Senkowski*, 23 F. Supp.2d 246, 267-68 (E.D.N.Y. 1998) ( "A sentencing judge may properly consider a defendant's remorse, or lack thereof, in determining a sentence. Doing so does not infringe a defendant's Fifth Amendment rights."), *aff'd* , 211 F.3d 6 (2d Cir.), *cert. denied* , 531 U.S. 1018, 121 S.Ct. 581, 148 L.Ed.2d 497 (2000). Here, the trial judge made no effort to compel petitioner to testify, nor did he threaten petitioner with additional punishment if he refused to cooperate.

-16-

Thus, Miller's Fifth Amendment rights were not impaired during the sentencing hearing. To the contrary, the judge was well within his discretion in taking into account Miller's failure to accept responsibility for his actions. Finally, I note that the court declined to impose the maximum sentence of twenty-five years requested by the prosecutor and authorized by state statute. This claim provides no basis for habeas relief.

## CONCLUSION

For the reasons stated above, petitioner Arthur Miller's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:     January 20, 2006
           Rochester, New York.