UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ARTHUR MILLER,

                Petitioner,           **DECISION AND ORDER**
                                                                       No. 01-CV-0657
     -vs-

HANS G. WALKER, Superintendent,

                Respondent.
_____

## INTRODUCTION

Petitioner, Arthur Miller ("Miller"), filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court on charges of robbery and petit larceny. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Miller's conviction stems from his involvement in the robbery of a Wilson Farms convenience store in the City of Rochester on December 22, 1995. Miller was charged with first and second degree robbery and petit larceny. The other perpetrator, David "Chainsaw" Adams ("Adams"), was arrested and similarly charged. Adams gave a confession admitting to several crimes, including the Wilson Farms robbery. He stated that he had a black male as an accomplice, but he refused to give this individual's name. Adams subsequently pled guilty to the charges against him. Miller was later identified through other sources as the accomplice. Miller was tried before a jury in Monroe County Court (Bristol, J.).

At trial, Nia Harrison ("Harrison"), who was working as a cashier that night, testified that at about 8:50 p.m., a white male wearing a bandanna on his head and a black male wearing a black and yellow jacket came into the store. The black male put three items on the counter to be rung up–a six-pack of beer, a rose, and a Slim Jim. T.262.[1] Harrison recalled that he asked her if she would like him to buy her a rose; however, she declined. When Harrison opened the cash drawer to make change for the $10 bill that the black male had given her, the white male came over and told her to leave the drawer open. T.263. He said that he had a gun and motioned with his hand, which was in his coat pocket, as if he had a weapon. T.263. Harrison gave the white male all the money in the drawer plus the $10 bill. During that time, the black male was taking items of merchandise that were around the cash register. The black male did not pay for any of those items. T.264. Harrison could not identify Miller from a police mug book, but she did identify him at trial. As defense counsel pointed out, however, Miller was the only black male in the courtroom.

The two men then left together, and Harrison called out to the store manager, Michelle Rich ("Rich"), who then ran outside and attempted to get the license plate number of the robbers' car. Once outside, Rich saw a black hatchback backing out in reverse, and she recognized the white male and black male men she had seen at Harrison's cash register inside the store. (Rich did not witness the robbery, however.) Rich testified that the black male in the car was "looking directly at her, yelling something" and "shaking his head around." He then "tapped a barrel of a gun on the window." T.354. Rich could not hear what he was saying. *Id.* Rich described the handgun as silver-colored. *Id.*

---

[1] Citations to "T.__" refer to the trial transcript.

The Wilson Farms happened to be equipped with a video camera, so the entire robbery was captured on videotape. The tape was introduced into evidence and Harrison gave a narration of the events depicted on it, consistent with her testimony. The videotape depicted Miller consistently moving to the end of the line he was standing in. It also showed Miller and Adams, standing together, watching people come into the store.

Tracey Van Orden ("Van Orden"), Chainsaw Adams's girlfriend, testified for the prosecution that she was waiting in the car (a black hatchback) outside with Miller's brother, Kenzo Miller ("Kenzo"), during the robbery. T.289. She saw the cashier lean over and hand Adams the money, but she did not see what Miller was doing. *Id.* Adams and Miller came out and got in the car; Adams took the money and threw it at Kenzo and said that "he was not no [*sic*] punk." T.290. Apparently, Kenzo had called Adams a "punk" because he (Adams) had not carried through on a robbery of a Radio Shack attempted earlier that evening. T.309. Adams was in the driver's seat and Miller was in the back. T.304. When asked what Miller did while Rich was attempting to write down the license plate number, Van Orden said that Miller "[t]urn[ed] back" "[t]owards the lady." She continued, unprompted, "Everybody said he had a gun there, but I didn't see no gun." T.291. The court sustained defense counsel's hearsay objection to that statement.

Van Orden then testified that she did not see what Miller had in his hands. T.291. The prosecutor asked to have Van Orden declared a hostile witness and attempted to impeach her with a statement she made to police on April 15, 1996, in which she said that she "knew" Miller had a silver-colored handgun in his pocket because "[i]t was Chainsaw's gun, and it was supposed to be passed to A.J. [Miller]." T.299-300. She maintained that she did not see the gun

with her own eyes, however. T.299.

Van Orden admitted that the week prior to trial, she met with the prosecutor and told him that she saw Miller show a handgun to Rich, the store manager who had come outside. T.303. Van Orden testified that she was lying when she told the prosecutor that, and that she was telling the truth at trial. *Id.*

On cross-examination, Van Orden testified that Adams told her that "if anybody mention [*sic*] anything about a gun, just say that Arthur Miller had it in his possession." T.308. She said that was why she told the authorities in the first place that Miller had a gun. *Id.*

Investigator Douglas Boccardo ("Boccardo") of the Rochester Police Department testified that he took a statement from Miller on April 17, 1996, after Miller had been picked up as a suspect in the Wilson Farms Robbery. T.321-22. Miller was advised of his *Miranda* rights and voluntarily agreed to waive them.  In his statement, Miller did not admit to participating in the robbery but did admit to stealing some Slim Jims:

> . . . All the way there they [Chainsaw and Kenzo and another white male, "Tim"] were arguing and telling each other that they fucked up, I guess because they didn't get shit at Radio Shack. Chainsaw pulled into the parking lot at the Wilson Farms. I told him that I was going in and getting something to drink. They told me to hurry the fuck up and get out because they had something else to do. I figured they were going to steal some more shit because they fucked up and didn't get anything at the Radio Shack. I went in by myself and got a six-pack of beer and a rose and went up to the cash register. I was kind of flirting with the girl at the cash register and I asked her if she wanted a rose. Chainsaw came in the store and up to the cash register. I paid for my stuff, the rose and that beer and when the cash drawer opened, Chainsaw stuck his hand inside his jacket like he had a gun and told the girl to give him the money. I grabbed some Slim Jims from the display by the register and left. I don't remember who left the store first, me or Chainsaw. I didn't have anything to do with that shit. I didn't know what he was up to. . . .

T.339-40. According to Miller's statement, the car they were using was a new black hatchback

belonging to his girlfriend.

On November 25, 1996, the jury returned a verdict convicting Miller of robbery in the first degree, robbery in the second degree, and petit larceny, as charged in the indictment. Miller was sentenced to determinate concurrent sentences of fifteen years incarceration for each of the robbery counts and one year for the petit larceny count.

Represented by new counsel, Miller appealed to the Appellate Division, Fourth Department, of New York State Supreme Court, which unanimously affirmed his conviction on February 16, 2000. *People v. Miller*, 269 A.D.2d 746, 703 N.Y.S.2d 413 (App. Div. 4th Dept. 2000). The New York Court of Appeals denied leave to appeal on May 31, 2000. *People v. Miller*, 95 N.Y.2d 800, 733 N.E.2d 240, 711 N.Y.S.2d 168 (N.Y. 2000). Miller did not file any collateral applications in state court for post-conviction relief.

This habeas petition was filed on June 4, 2001. As grounds for relief, Miller raises the same four grounds that he asserted in his direct appeal. Respondent has not asserted the defense of non-exhaustion, and all of Miller's claims appear to be fully exhausted and properly before this Court for review.  See 28 U.S.C. § 2254(b)(1). For the reasons set forth below, Miller's petition for a writ of habeas corpus is denied.

## DISCUSSION

### Standard of Review

To prevail under 28 U.S.C. § 2254, as amended in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was

based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

**Merits of the Petition**

**1.     Excessiveness of pre-trial bail**

"It is clear that federal habeas corpus is available to test the constitutionality of the excessiveness--or denial--of bail by a state court to a prisoner awaiting trial." *Bobick v. Schaeffer*, 366 F. Supp. 503 (S.D.N.Y. 1973) (citing *In re Shuttlesworth*, 369 U.S. 35, 82 S.Ct. 551, 7 L.Ed.2d 548 (1962); *United States ex rel. Covington v. Coparo*, 297 F. Supp. 203 (S.D.N.Y. 1969)); *accord Steed v. New York Executive Dept. Div. of Parole*, 2000 WL 1593342, at *5 (S.D.N.Y. Oct. 25, 2000). It is equally clear, however, that a federal court will only inquire into whether the state judge's setting of bail is arbitrary or discriminatory or results in the denial of counsel or the denial of a fair trial. *Id.* (citation omitted); *see also Finetti v. Harris*, 609 F.2d 594, 599 (2d Cir. 1979) ("[W]hile there is no absolute federal constitutional right to bail pending appeal, once a state makes provision for such bail, the Eighth and Fourteenth Amendments require that it not be denied arbitrarily or unreasonably.") (citing *Brown v. Wilmot*, 572 F.2d 404, 405 (2d Cir. 1978)).

At the time of the bail hearing on June 3, 1996, Miller was out on $10,000 cash or bond. The prosecutor noted that Miller was a predicate felon from 1990 on an assault charge, and that he had a bench warrant history and several misdemeanor charges, including a 1995 conviction for second degree menacing. The prosecutor asked the court to leave the bail at $10,000 or raise it to $25,000 cash, given the strength of the People's case, combined with Miller's bench warrant history and predicate felon status. The prosecutor noted that, as a result of Miller's statement to

the police, there were two witnesses who testified at the preliminary hearing what Miller and his co-defendant did while in and out of the store on the day of the robbery. Defense counsel argued that the People's case was not that strong, acknowledged his client's predicate felon status and warrant history, and asked the court to set bail at $7,500. The court paused to read the bail report prepared by the prosecution and then announced, "Hundred thousand cash will be fine." B.8.[2]

Just prior to trial, defense counsel asked the trial judge to recuse himself, based on his imposition of "excessively high bail." The judge denied the request and stated that he had "no anger or animosity" toward Miller but that he "thought [Miller's] record and the strength of this case justified a significant bail, given the significant jeopardy that is here." T.11-12. The judge assured Miller that he would give him (Miller) a fair trial. *Id.*

The court's articulated reason for setting Miller's bail was neither arbitrary nor discriminatory. Indeed, a court is entitled to exercise its independent judgment in setting bail and should not be confined to the prosecutor's recommendations in exercising its discretion. Furthermore, after reading the transcript of petitioner's trial in its entirety, there is no question in this Court's mind that he received a fair trial. This claim is without merit.

**2.      Abuse of discretion in trial court's limitation of cross-examination**

Miller contends that the trial court abused its discretion when it interfered with defense counsel's proper cross-examination of an adverse witness. During cross-examination of prosecution witness Van Orden, the co-defendant's girlfriend, defense counsel attempted to ask her leading questions requiring a "yes" or "no" response. When counsel interrupted the witness as she began to answer more than "yes" or "no," the trial court told him he was being impolite

---

[2] Citations to "B.__" are to the transcript of the bail hearing.

and made counsel allow the witness to answer how she wanted:

> Q. And when you pulled into the Wilson Farms, isn't it a fact that Mr. Miller got out of the car first and walked into the store by himself?
> A. Yes. On that - -
> Q. And that David Adams - -
> The Court:	Excuse me. Let her finish her answer.
> A. David Adams came from behind, and when he got in, the thing had already - - the lady had already opened the cash register for AJ [Miller].
> The Court:	Let her finish the answer and then it's your turn. If you think it's unresponsive, sir, I will entertain a motion to strike it.
> Mr. Murray:	Judge, this - -
> The Court:	But we can't all be talking at the same time. So I direct you, sir, to let her finish her answer; okay?
> Mr. Murrary:	I am cross-examining the witness.
> The Court:	Fine. But you can't do it at the same time she is talking.
> Mr. Murray:	I don't believe that she can be allowed to answer more than I have asked.
> The Court:	I will decide that, not you.
> Q. So there was no conversation in the car, prior to pulling into the parking lot about robbing Wilson Farms; correct?
> A. Chainsaw was telling Kenzo that he was - -
> Mr. Shur [*sic*]:	Objection, Your Honor.
> The Court:	Overruled. Let's hear what she has got to say. You started to say.
> A. They went - -
> The Court:	Time out. Time out. We are going to - - This isn't in the courtroom law, it's called politeness. When you talk, I listen. When I talk, you listen. It goes for everybody. That is what my mama taught me. Go ahead. Finish. You started to say that Chainsaw told Kenzo - -

T.311. Van Orden continued her testimony. That was the last incident of that kind during the trial.

A criminal defendant's "most basic right" is that of a "fair trial at which the witnesses against him might be meaningfully cross-examined." *United States v. Wade*, 388 U.S. 218, 224

(1967) (quoted in *United States v. Medico*, 557 F.2d 309, 321 (2d Cir. 1977)). On cross-examination, leading questions are appropriately directed toward a witness called by an adverse party. Certainly, it was appropriate for defense counsel to insist that Van Orden, a prosecution witness, answer his leading questions with a simple "yes" or "no," so as to avoid the possibility that defense counsel might help make the prosecution's case for it. Thus, I have no difficulty in determining that the trial court's interference with defense counsel's cross-examination was clearly erroneous and evidenced a lack of understanding of the basic premise of cross-examination.

Nevertheless, it does not appear that the trial court was acting out of personal animosity toward petitioner or that he was singling out defense counsel; the court sustained a number of defense counsel's objections and limited the prosecutor's questioning of witnesses as well. Rather, it appears that the trial judge was mistaken about the basic rules of cross-examination.

Reversal based on inappropriate judicial participation is warranted only when such conduct "destroy[s] the impartial, judicious, and, above all, responsible . . . courtroom atmosphere in which guilt or innocence [must] be soberly and fairly tested." *United States v. Navarro*, 472 F.2d 302, 309-11 (2d Cir. 1973) (reversing conviction where trial judge's vigorous participation in examining defendant and defense witness, especially when contrasted with relative freedom from hostile interruption of prosecution's witnesses, and numerous acrimonious exchanges with defense counsel, many of which occurred in the presence of the jury, destroyed the impartial and judicious courtroom atmosphere; error not cured by cursory charge that jury should not draw any inference from rulings made during course of trial) (quotations omitted). This, however, clearly was not a case where the trial court's limited, albeit erroneous,

interference with defense counsel's questioning crossed the line "separating permissible and impermissible judicial conduct," *Navarro*, 472 F.2d at 313. Habeas relief is not warranted on this claim.

**3.     Trial court erred in refusing to give missing witness charge**

After both sides rested, defense counsel requested that the court give a missing witness with respect to co-defendant Chainsaw Adams. Defense counsel claimed that Adams was under the control of the prosecution and he "no longer could assert any right against self-incrimination." Defense counsel argued that since Adams was not produced, one could infer that it was because he "would not have been beneficial to the People's case." T.369. The prosecutor responded that Adams's testimony would be cumulative and that the request was untimely. The prosecutor also noted that he had provided defense counsel with the witness list at the beginning of trial, and Adams was not on it. Finally, he stated that based on the discovery documents provided to the defense and given the way that Adams's girlfriend testified, there was no indication that Adams would cooperate with or testify favorably on behalf of the People. T.369-70. The trial court summarily denied the application. T.370.

On direct appeal, the Appellate Division held that the trial court properly denied defense counsel's request for a missing witness charge as untimely. *People v. Miller*, 269 A.D.2d at 746-47 (citing *People v. Gonzalez*, 68 N.Y.2d 424, 509 N.Y.S.2d 796 (N.Y. 1986) (In all events, the [missing witness] issue must be raised as soon as practicable so that the court can appropriately exercise its discretion and the parties can tailor their trial strategy to avoid "substantial possibilities of surprise[.]")). Respondent argues that Miller's claim is procedurally barred, given the Appellate Division's ruling that counsel's request, made after the close of evidence, was

untimely.

Where the last state court rendering a judgment in the case issues a decision containing a "plain statement" that its decision on a question of federal law rests upon "adequate and independent state grounds," the rule of procedural default bars consideration of the federal claim on both direct and habeas review. *Harris v. Reed*, 489 U.S. 255, 262 (1989); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (The Supreme Court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); *Lee v. Kemna*, 534 U.S. 362, 375 (2002). The "adequate and independent state grounds" doctrine "applies whether the state law is substantive or procedural." *Coleman*, 501 U.S. at 729. "[U]nless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice," an adequate and independent finding of procedural default will bar federal habeas review of the federal claim. *Harris*, 489 U.S. at 262 (citations and internal quotation marks omitted). *See also Reyes v. Keane*, 118 F.3d 136, 138 (2d Cir. 1997).

The mere invocation of a state procedural bar rule to deny a claim does not, in itself, automatically preclude federal review of that claim. Rather, it is the responsibility of the federal court to ensure that the state rule is "adequate" and "independent." *Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003) (citing *Garcia v. Lewis*, 18 F.3d 71, 77 (2d Cir. 1999)). Looking first at the "independent" prong of the analysis, the procedural basis of the state court's decision "must be 'clear from the face of the opinion'" in order to qualify as an "independent" state ground. *Fama v. Commissioner of Corr. Svcs.*, 235 F.3d 804, 809 (2d Cir. 2000) (quoting *Coleman v.*

*Thompson*, 501 U.S. at 735). Here, the Appellate Division's opinion contains a plain statement that its denial of Miller's claim rested on the state procedural rule that a request for a missing witness charge must be made prior to the close of the proofs.

Turning to the "adequacy" inquiry, the Second Circuit has explained that a procedural bar is "adequate" to support a state court judgment only if it is based on a rule that is "firmly established and regularly followed" by the state in question in the "specific circumstances presented" by petitioner's case. *Cotto v. Herbert*, 331 F.3d at 239-41 (citing *Lee v. Kemna*, 534 U.S. at 386-87). The adequacy of a state procedural bar must be determined with reference to the "particular application" of the rule; it is not enough that the rule "generally serves a legitimate state interest." *Id.* (citing *Lee*, 534 U.S. at 386-87).

In the present case, it appears that the state appellate court's denial of Miller's claim regarding the missing witness instruction as untimely is a procedural rule that is both firmly established and regularly followed by courts in New York state presented with factual circumstances akin to those in Miller's case. *E.g.*, *People v. Ramos*, 19 A.D.3d 436, 799 N.Y.S.2d 524 (App. Div. 2d Dept. 2005) (since the defendant waited until both sides rested at the close of the evidence to request the charge, his request was untimely and thus was properly denied ); *People v. Catoe*, 181 A.D.2d 905, 582 N.Y.S.2d 299 (App. Div. 2d Dept. 1992) (same); *People v. Rosario*, 277 A.D.2d 943, 716 N.Y.S.2d 235 (App. Div. 4th Dept. 2000) (same); *People v. Gayle*, 162 A.D.2d 261, 556 N.Y.S.2d 619 (App. Div. 1st Dept. 1990) ("The request [for a missing witness charge] was untimely in that it was made after the defense case, and thereby deprived the prosecution of the opportunity to tailor its trial strategy, under the particular facts of this case, to avoid 'substantial possibilities of surprise[.]'"); *People v.*

*Waldron*, 154 A.D.2d 635, 546 N.Y.S.2d 460 (App. Div. 1989) ("The record reveals that the defendant was aware during the early stages of the proceedings that the People did not intend to call these witnesses. The defendant waited, however, until both sides had rested at the close of evidence to make his request to charge. The untimely request put the People at a great disadvantage and was thus correctly denied[.]"); *People v. Watson*, 134 A.D.2d 729, 521 N.Y.S.2d 548 (App. Div. 3d Dept. 1987) (same).[3] Thus, the Court fairly may conclude that the Appellate Division's application of the timeliness rule to this situation is adequate to preclude federal habeas review of this claim.

Miller may avoid the effect of the procedural default only if he is able to show "cause for the default *and* actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750 (emphasis supplied). The "cause" standard requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts" to raise the claim in state court. *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (quotation omitted) ("Objective factors that constitute cause include 'interference by officials' that makes compliance with the State's procedural rule impracticable, and 'a showing that the factual or legal basis for a claim was not reasonably available to counsel.'"). Once the petitioner demonstrates "cause" for the default, he also must show "actual prejudice" resulting from the errors of which he complains. *Id.* (quotation omitted). Miller has not alleged "cause" for the default, and none is evident on the

---

[3] While there is authority that a request for a missing witness charge made before rebuttal is timely, *see People v. Robertson*, 205 A.D.2d 243, 618 N.Y.S.2d 330, 332 (App. Div. 1st Dept. 1994), the factual circumstances of that case are different than those presented here. In *Robertson*, the uncalled witness actually was listed on the prosecution's witness list. Here, however, defense counsel knew at the start of trial that the prosecution was not planning on calling Chainsaw Adams since he was *not* on the prosecution's witness list.

record before the Court.

Furthermore, Miller cannot show actual prejudice resulting from the default: even if Miller arguably were entitled to the missing witness charge–assuming that counsel had made a timely request–the trial court's failure to issue it did not result in a constitutional violation. Ordinarily, a state trial court's jury instruction, such as a missing witness charge, is a matter of state law, and any error in connection therewith is not cognizable on habeas review. *See* 28 U.S.C. § 2254(a). Like the failure to give any other jury instruction, the failure to issue a missing witness instruction does not raise a constitutional issue and cannot serve as the basis for federal habeas relief unless the failure "so infected the entire trial that the resulting conviction violated due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *accord*, *e.g.*, *Leecan v. Lopes*, 893 F.2d 1434 (2d Cir. 1990). Thus, even if this Court were to consider the missing witness claim on federal habeas review, it would not find that the failure to give the instruction rendered petitioner's trial fundamentally unfair.

Finally, this is not one of the "extraordinary" situations where a constitutional violation "probably has caused the conviction of one innocent of the crime." *McCleskey*, 499 U.S. at 494 (citation omitted). Miller thus is unable to fulfill the requirements for the "fundamental miscarriage of justice" exception to the procedural default rule. *See id.* Accordingly, this Court is precluded from considering the merits of Miller's claim that the trial court erred in refusing to issue a missing witness instruction.

### 4.  Vindictive Sentence

Miller contends that he was sentenced vindictively to a sentence of fifteen years because he exercised his right to go to trial. He claims that the trial court's vindictiveness is evidenced by

the ten-year sentence received by co-defendant Chainsaw Adams, who pleaded guilty after being charged with three offenses based on his participation in the Wilson Farms robbery.

During the sentencing hearing, the trial court compared Wilson to Adams, saying that "Chain Saw [*sic*] would at least come in and take a plea and says [*sic*] I am bad, I did all of this stuff and I'm sorry." S.10.[4] The court commented that after watching the store videotape of the robbery, he had "never seen a clearer case of someone acting in concert." *Id.* He stated that Miller was "too thoughtless, too impaired to understand that [he] [was] a partner" in the robbery. *Id.* Based on these considerations, the trial court sentenced Miller to a fifteen-year term of imprisonment.

I do not find in the trial court's remarks an implicit suggestion that Miller should be penalized for exercising his constitutional right to a trial; rather, it was Miller's lack of remorse and refusal to accept responsibility of his actions that animated the judge's sentencing decision. The Supreme Court has explained that "the evolutionary history of sentencing . . . demonstrates that it is proper--indeed, even necessary for the rational exercise of discretion--to consider the defendant's whole person and personality, as manifested by his conduct at trial and his testimony under oath, for whatever light those may shed on the sentencing decision." *United States v. Grayson*, 438 U.S. 41, 53 (1978). It is well-recognized that a defendant's manifestation of remorse and his acceptance of responsibility for his conduct are proper factors to consider in sentencing. *E.g.*, *United States v. Jacobson*, 15 F.3d 19, 23 (2d Cir. 1994) (finding a defendant's lack of remorse to be an individual, distinctive factor that may support sentencing disparity); *United States v. Blair*, 958 F.2d 26, 30 (2d Cir. 1992) (upholding denial of sentencing adjustment

---

[4] Citations to "S.__" refer to the transcript of the sentencing hearing.

under federal sentencing guidelines where defendant accepted responsibility one week before sentencing, suggesting lack of sincerity); *United States v. Cousineau*, 929 F.2d 64, 69 (2d Cir. 1991) (adjustment under federal sentencing guidelines properly denied where defendant admitted guilt but did not show remorse or acknowledge wrongfulness of conduct).

"While the Fifth Amendment provides a 'safeguard against judicially coerced self-disclosure' that extends to the sentencing phase of a criminal proceeding, *Mitchell v. United States*, 526 U.S. 314, 322 (1999) (quotation omitted), it does not bar a court from considering a defendant's lack of remorse." *Geraci v. Senkowski*, 23 F. Supp.2d 246, 267-68 (E.D.N.Y. 1998) ( "A sentencing judge may properly consider a defendant's remorse, or lack thereof, in determining a sentence. Doing so does not infringe a defendant's Fifth Amendment rights."), *aff'd*, 211 F.3d 6 (2d Cir.), *cert. denied* , 531 U.S. 1018 (2000). Here, the trial judge made no effort to compel petitioner to testify, nor did he threaten petitioner with additional punishment if he refused to cooperate. Thus, Miller's Fifth Amendment rights were not impaired during the sentencing hearing. To the contrary, the judge was well within his discretion in taking into account Miller's failure to accept responsibility for his actions. Finally, I note that the court declined to impose the maximum sentence of twenty-five years requested by the prosecutor and authorized by state statute. This claim provides no basis for habeas relief.

## CONCLUSION

For the reasons stated above, petitioner Arthur Miller's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:     February 9, 2006
           Rochester, New York.